T.C. Memo. 2019-3

UNITED STATES TAX COURT

2590 ASSOCIATES, LLC, 5615 ASSOCIATES, LLC, AS SUCCESSOR IN
INTEREST TO, 5615 ASSOCIATES, LP, TAX MATTERS PARTNER,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12924-16.                    Filed January 31, 2019.

Jaye A. Calhoun, Sean T. McLaughlin, and David P. Hamm, Jr., for
petitioner.

Emile L. Hebert III and Susan S. Canavello, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Respondent issued a notice of final partnership

administrative adjustment (FPAA) to 2590 Associates, LLC (2590 Associates), for

2011 disallowing a worthless debt deduction of $2,926,692.  The issue for

**[\*2]** consideration is whether 2590 Associates is entitled to deduct the worthless debt.[1] We hold it is entitled to the deduction.

## FINDINGS OF FACT

When the petition was timely filed, 2590 Associates had its principal place of business in Louisiana. 5615 Associates, LLC (5615 Associates), is the successor in interest to 5615 Associates, LP, the tax matters partner of 2590 Associates.

Joseph Spinosa is a real estate developer who has been involved in the real estate industry for several decades. Over that time he has developed apartment, office, and retail buildings representing over 5,000 apartment units, 1.5 million square feet of office space, and 600,000 square feet of retail space. He owns multiple real estate ventures through numerous business entities and has commingled funds among his different entities. His role in the real estate ventures is to provide a vision of the development suitable for a site, assemble a team of architects and engineers to convert the vision to reality, perform economic and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar. The parties' stipulation of facts with accompanying exhibits is incorporated herein by this reference.

**[*3]** market analyses of the development, and raise equity or debt to finance the construction of the development.

I.      Background of Perkins Rowe

Mr. Spinosa organized two companies, Perkins Rowe Associates, LLC (Perkins Rowe I), and Perkins Rowe Associates II, LLC (Perkins Rowe II), to acquire and develop two adjacent 20-acre parcels of real estate into a mixed-use shopping center with 10 buildings of residential, retail, and office space. Perkins Rowe I was owned 45% by Mr. Spinosa, 5% by the Spinosa Class Trust, a trust for the benefit of Mr. Spinosa's children, and 50% by members of the Schwegmann family, the former owners of one of the 20-acre parcels. Perkins Rowe II was owned 90% by Mr. Spinosa and 10% by the Spinosa Class Trust. Mr. Spinosa was the manager of both entities. We refer to the two entities collectively as Perkins Rowe and the two parcels as the Perkins Rowe property.

In early 2006 Perkins Rowe was in discussions with KeyBank National Association (KeyBank) for a construction loan to finance the development of the Perkins Rowe property. At that time sitework had begun. Before the loan's approval Perkins Rowe needed capital to continue the sitework. Mr. Spinosa obtained a $2 million bridge loan from his acquaintance and business associate Nick Saban (Saban loan). Mr. Spinosa had met Mr. Saban through Mr. Saban's

**[\*4]** efforts as the head football coach at Louisiana State University (LSU) in Baton Rouge, Louisiana, to improve the graduation rate of LSU athletes. The two men often discussed real estate investments and had joint ownership of a number of real estate ventures. At the time of the loan Mr. Saban was the head football coach of the Miami Dolphins in the National Football League.

Perkins Rowe I and II jointly executed a promissory note dated April 11, 2006, to Mr. Saban of $2 million plus annual interest on the unpaid principal balance at 16% with a maturity date of April 10, 2007 (2006 note). Mr. Saban transferred $2 million to Perkins Rowe on April 12, 2006. The 2006 note was unsecured. Under the terms of the note Perkins Rowe's failure to pay the principal and accrued interest within 10 days of its maturity date constituted a default, and upon default, interest on the unpaid principal balance accrued at 18%. The note also provided for an award of attorney's fees to Mr. Saban in the event he engaged an attorney in connection with collection of the loan. Mr. Saban did not have an equity interest in Perkins Rowe, did not participate in its management, and did not have any member voting rights.

II. The Construction Loan

On May 23, 2006, shortly after the execution of the 2006 note, KeyBank obtained an appraisal of the Perkins Rowe property on a fee simple, as-is basis of

**[*5]** approximately $34.4 million and a prospective market value of $240 million for the developed, stabilized project upon its completion, estimated to occur on May 1, 2008. At the time of the appraisal Perkins Rowe had preleased approximately 70% of the retail space to major retailers, including a book store, a grocery store, a pharmacy, a fitness center, and a movie theater, and approximately 50% of the office space. In July 2006 KeyBank, as lender and as agent of nine lenders, and Perkins Rowe executed a loan agreement and mortgage, and Perkins Rowe executed a promissory note for each lender for a total of $170 million (construction loan) with an initial maturity date of August 1, 2009. The loan agreement permitted Perkins Rowe to extend the initial maturity date for one year if certain conditions were met. Perkins Rowe was not required to make any payments on the principal until the maturity date. Mr. Spinosa executed a personal guaranty for the loan.

Upon the closing of the loan Perkins Rowe received a disbursement of approximately $23 million. As part of this initial disbursement Perkins Rowe received approximately $3.7 million for reimbursement of excess equity, which it used for construction costs, and approximately $8.5 million as a construction draw for a total receipt of approximately $12.2 million. Originally, Mr. Spinosa had planned to repay the Saban loan when Perkins Rowe received this first

**[*6]** disbursement on the construction loan. However, he became concerned with cost overruns and problems with the site preparation work that had already caused the project to fall behind schedule. Mr. Spinosa decided not to use the initial disbursement to repay the Saban loan. However, he did not view the delay as significant because building construction had not started. He discussed the delays and cost overruns with Mr. Saban. At that time Perkins Rowe was able to pay its expenses as they came due in the ordinary course of its business.

III.    Problems With the Development

In April 2007 Mr. Spinosa asked Mr. Saban to extend the due date for repayment of the Saban loan because of problems with a general contractor that was eventually terminated. Perkins Rowe executed a second promissory note dated May 29, 2007 (2007 note), for a principal amount of $2,362,959 (the original $2 million loan and accrued, unpaid interest) plus annual interest on the unpaid principal balance at 16% with a maturity date of June 1, 2008. The parties executed the 2007 note after the 2006 note's maturity date. The 2007 note included the same default terms and attorney's fees award as the 2006 note. At that time Perkins Rowe was able to pay its bills as they came due in the ordinary course. At the time of the 2007 note Perkins Rowe had preleased approximately

[*7] 70% to 80% of the development. In late 2007 Perkins Rowe also had contracts for sale on approximately 80 condominium units (condos) in the development.

In late 2007 Perkins Rowe discovered problems with the architecture plans for the apartment complex. As construction neared completion Mr. Spinosa worked with the architects and the construction crew to redesign the floor plans of the apartments because of drainage problems. Despite his diligence in the hiring process, Mr. Spinosa blamed engaging an architect who was inexperienced in residential construction. The problems resulted in cost overruns and the need for additional capital. In late 2007 Perkins Rowe sought a $15 million loan from KeyBank. Ultimately it obtained the $15 million from a real estate investment trust in exchange for an interest in another of Mr. Spinosa's real estate projects unrelated to Perkins Rowe.

Around this same time Perkins Rowe and KeyBank discussed refinancing the $170 million construction loan and increasing the loan principal to $215 million. KeyBank orally approved the refinancing subject to an appraisal. In January 2008 KeyBank obtained a second appraisal of the Perkins Rowe property. The appraisal, dated January 15, 2008 (2008 appraisal), valued the development between $227 million as is and $254 million upon completion (estimated to be in

**[\*8]** April or June 2008), plus $15.6 million in excess land. The 2008 appraisal stated that the executed leases represented the occupancy rates for office and retail space of approximately 73% and 87%, respectively, and letters of intent and leases awaiting lessor signatures would have brought the retail occupancy rate to above 90%. Mr. Spinosa also attempted to raise capital for the project through the use of tax-exempt Gulf Opportunity Zone (GO Zone) Government bonds.[2] Perkins Rowe had been approved to issue $250 million in GO Zone bonds. The appraisal valued the completed project with the use of the GO Zone bonds at approximately $310 million.

Despite the fact the 2008 appraisal estimated that Perkins Rowe had significant equity in the project, KeyBank did not approve the refinancing. Moreover, it delayed informing Perkins Rowe of its decision. During 2008 the real estate market experienced a significant economic downturn. Mr. Spinosa surmised that KeyBank was aware of the problems in the real estate financing market long before the public knew. He believed that KeyBank felt pressure to reduce the amount of its outstanding loans. However, throughout this time he

---

[2]The Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, sec. 101(a), 119 Stat. at 2578, exempted from taxation interest paid on certain bonds, referred to as GO Zone bonds, used to finance private development projects in areas affected by Hurricane Katrina.

[*9] assumed that KeyBank would refinance the construction loan, and he remained optimistic about the success of Perkins Rowe.

IV.    Transfer of the Saban Loan to 2590 Associates

Throughout this time Mr. Spinosa kept Mr. Saban informed about the development's progress, and Mr. Saban visited the development site on several occasions to inspect the progress. Around the June 2008 maturity date of the 2007 note, Mr. Saban asked Mr. Spinosa about a plan to repay the Saban loan. Mr. Saban wanted to know how Perkins Rowe would get it done. Mr. Spinosa did not want to have Perkins Rowe pay the 2007 note at that time because the development remained under construction. However, he understood that Mr. Saban wanted options to get the loan satisfied and the debt paid off.

In a memorandum dated July 26, 2008 (July 2008 memorandum), Mr. Spinosa offered Mr. Saban five options to "satisfy the debt currently due from Perkins Rowe":  (1) transfer Mr. Spinosa's 50% ownership in Watermarke Apartments to Mr. Saban; Mr. Saban already owned the remaining 50%; (2) transfer a percentage of Mr. Spinosa's ownership in Cinco Ranch Apartments to Mr. Saban; Mr. Saban already owned approximately 14% and Mr. Spinosa owned 82%; (3) transfer an ownership interest in the Rouzan property to Mr. Saban; (4) organize a new partnership between the two men to develop a hotel

[*10] near the Perkins Rowe development with Mr. Saban contributing the 2007 note in exchange for his partnership interest and Mr. Spinosa's contributing an equal amount of capital; or (5) renegotiate the 2007 note to reduce the interest rate to 12% and delay repayment until Perkins Rowe's cashflow allowed.

Mr. Saban chose option (3), an ownership interest in the Rouzan property. The Rouzan property was a 120-acre parcel of real estate in Baton Rouge, Louisiana, that Mr. Spinosa planned to develop into a residential community composed primarily of single-family houses. 2590 Associates owned the Rouzan property. 5615 Associates was its sole member from its organization in October 1997 until the transaction transferring ownership to Mr. Saban in December 2008. 5615 Associates was owned 90% by the Spinosa Class Trust and 10% by JTS Associates of Louisiana, Inc. (JTS Associates), an entity related to Mr. Spinosa. Mr. Spinosa was the manager of 5615 Associates and 2590 Associates.

Mr. Spinosa had acquired the Rouzan property in 2005, but development was delayed because of a prolonged dispute over zoning that lasted approximately from 2005 to 2008. As originally zoned approximately 200 to 225 houses could be constructed on the Rouzan property. Sometime around 2008 the property was rezoned to allow for the construction of approximately 750 houses, significantly increasing the property's value. Mr. Saban had expressed an interest in the

[*11] Rouzan property early on in the development process. The property became a more attractive investment opportunity for him because the zoning dispute had ended.

In the July 2008 memorandum Mr. Spinosa listed the appraised value of the Rouzan property as $51,610,000 and his equity in the property as $24,550,000, determined as follows:

| Item | Amount |
|---|---|
| Current appraised value | $51,610,000 |
| Discounted to 80% appraised value | 41,288,000 |
| Less current debt | (15,500,000) |
| Less estimated design/engineering cost to date | (750,000) |
| Equity | [1]24,550,000 |

[1]We note that the items and amounts listed in the July 2008 memorandum calculate to equity of $25,038,000. The memorandum states that the estimated design/engineering cost to date is "[e]xclusive of cost associated with TND status and rezoning". There is no further explanation of this cost in the July 2008 memorandum.

On the basis of these values Mr. Spinosa proposed that Mr. Saban would receive a 12.2% interest in 2590 Associates representing his $3 million investment, approximately equal to the 2007 note's principal plus accrued, unpaid

**[\*12]** interest. Mr. Saban negotiated to decrease the value of the Rouzan property thereby increasing his percentage ownership in 2590 Associates to 15%.

There was no business relationship between Perkins Rowe and 2590 Associates, and the developments were unrelated. However, Mr. Spinosa managed both entities, and the entities had some common ownership. The Spinosa Class Trust owned 90% of 2590 Associates through 5615 Associates, 5% of Perkins Rowe I, and 10% of Perkins Rowe II. Mr. Spinosa owned 45% of Perkins Rowe I and 90% of Perkins Rowe II. He also had an indirect ownership interest in 2590 Associates through JTS Associates' 10% ownership. There was no discussion about the value of the 2007 note in the negotiations over Mr. Saban's percentage ownership in 2590 Associates, and Mr. Spinosa did not consider that the note had a fair market value less than its face value.

Mr. Saban did not want to directly own 2590 Associates because of privacy concerns. At the time he was the head football coach at the University of Alabama and felt there was negative public sentiment toward him in the Baton Rouge area because of his decision to leave LSU. He wanted to receive his interest through a business entity. On November 26, 2008, Henry C. Perret, Jr., Mr. Saban's attorney, organized TLS Investments, LLC (TLS Investments), to hold Mr.

[*13] Saban's ownership in 2590 Associates. TLS, LLC (TLS), was TLS Investments' sole member. Mr. Saban and his wife were TLS' sole members.

Perkins Rowe I executed a promissory note dated December 2, 2008, for $2,926,692 (2008 note), plus annual interest on the unpaid principal of 16% compounded annually, payable to Mr. Saban on August 19, 2010. Mr. Perret structured the transaction including the transfer of the 2008 note. For reasons unclear from the record, Perkins Rowe II did not join in executing the 2008 note. Similar to the two prior notes, the 2008 note was unsecured, charged a 16% interest rate that increased to 18% upon default, and provided for an award of attorney's fees for any collection actions. The 2008 note stated that it was "given in substitution" for the 2007 note. The 2007 note did not contain this term with respect to the 2006 note. Mr. Saban endorsed the 2008 note to TLS Investments as a capital contribution, and TLS Investments transferred the 2008 note to 2590 Associates through Mr. and Mrs. Saban's endorsement. 2590 Associates took physical possession of the note. Thereafter Mr. Saban did not have physical possession of a note issued by the Perkins Rowe entities.

On December 2, 2008, 2590 Associates amended its operating agreement to recognize TLS Investments' admission as a member in exchange for the contribution of the 2008 note to the capital of the company. The amended

[*14] operating agreement provided that the members recognized that the fair market value of the 2008 note was its face value, $2,926,692, and listed TLS Investments' capital account as that same amount. The amended operating agreement listed 5615 Associates' capital account as $16,584,586. Under the amended operating agreement, TLS Investments received a 15% allocation of the profit, gain, and loss. The amended operating agreement provided: "WHEREAS, Investor Member has contributed a certain promissory note of Perkins Rowe Associates, L.L.C. to the capital of the Company and the original Member and the Manager desire to admit him into the Company as an additional Member having the interest shown herein." Under the amended operating agreement, Mr. Saban, rather than TLS Investments, received the required member notices. At Mr. Saban's insistence, the operating agreement was also amended to impose restrictions on the amount of debt 2590 Associates could incur.

## V. Foreclosure Filing

In November and December 2008 Perkins Rowe failed to make required interest payments on the construction loan. No principal repayment was due until August 2009. In late 2008 Mr. Spinosa had been attempting to refinance the construction loan for nearly one year. He remained optimistic that Perkins Rowe could refinance the loan, and he remained optimistic about the future of the

[*15] project. In 2007 Mr. Spinosa sought to convert the apartments in the development to condos to make the development more economically viable and to address budget shortfalls. By late 2007 the condos were almost completed and most of the condos had contracts for sale. In June 2008 KeyBank and Perkins Rowe amended the loan agreement to allow the conversion of 88 apartments to condos and added Perkins Rowe Block A Condominiums, LLC, as a borrower. The amended loan agreement also gave Perkins Rowe the right to convey certain property within the development for a roadway to provide greater vehicular access to the development.

Many issues that Perkins Rowe faced were beyond its control. KeyBank also experienced financial problems during that time because of the crisis in the real estate financial market. KeyBank closed one of its offices that Perkins Rowe had worked with. In 2009 Perkins Rowe began to experience unusually long delays in disbursements from the construction loan, affecting its ability to pay contractors and vendors and causing delays in construction. In early 2009 Perkins Rowe lost the sale of a substantial number of the condos under contract because KeyBank delayed the release of its mortgage against the condos. KeyBank eventually released the mortgage in March or April 2009. The roadway was not completed. Perkins Rowe also lost some retail tenants that had preleased space

[*16] because of the tenants' inability to finance leasehold improvements, although some retail tenants were in place.

On July 28, 2009, KeyBank, representing nine lenders on the $170 million construction loan, filed a complaint against Perkins Rowe and Mr. Spinosa to collect on the loan, to foreclose on the property, and to enforce Mr. Spinosa's guaranty (foreclosure case). See KeyBank Nat'l Ass'n v. Perkins Rowe Assoc., LLC (KeyBank), No. 09-497-JJB-SCR (M.D. La. July 28, 2009). In the complaint, KeyBank alleged that Perkins Rowe had failed to make required monthly interest payments from November 2008 through July 2009. Principal repayment was not yet due. It was due at the loan's maturity, August 1, 2009. Mr. Spinosa believed that Perkins Rowe was approximately 90 days from being able to make the required loan payments. However, construction had already slowed considerably because of financing issues.

On July 29, 2009, the District Court granted KeyBank's request to sequestrate Perkins Rowe's assets and records and to appoint a keeper. The U.S. Marshals Service seized Perkins Rowe's assets and records and delivered them to the keeper who took over Perkins Rowe's operations. Perkins Rowe filed counterclaims against KeyBank and the other lenders. KeyBank filed a motion to dismiss the counterclaims, which the District Court granted in part and denied in

**[*17]** part, keeping alive most counterclaims. KeyBank, No. 09-497-JJB-SCR, 2010 U.S. Dist. LEXIS 59619 (M.D. La. June 16, 2010). After the foreclosure case's filing, Perkins Rowe continued to operate, and its tenants continued to pay rent. However, Perkins Rowe never received any funds or disbursements from the operation of the business. During this period Perkins Rowe also faced multiple lawsuits from contractors and vendors. Between August 2009 and March 2010 Perkins Rowe had a positive cashflow of nearly $900,000, which the keeper used to pay the keeper's expenses.

Despite the foreclosure case Mr. Spinosa believed that he could resolve the financing problems and could complete the Perkins Rowe project. He continued to negotiate with KeyBank and the other lenders. On multiple occasions he came close to negotiating a refinancing deal that would have stopped the foreclosure. However, one lender had sold its note to a hedge fund shortly after the foreclosure case began, and the hedge fund refused to renegotiate the terms of the loan or to accept any of the deals that KeyBank had brokered. Mr. Spinosa was also negotiating with other lenders and investors to refinance the construction loan if Perkins Rowe could settle the foreclosure case. He attempted to use the GO Zone bonds to entice new lenders and investors. However, the GO Zone bonds issued

**[*18]** to Perkins Rowe were terminated in 2011 because of its failure to place the bonds with investors.

Mr. Spinosa believed that many of KeyBank's actions resulted from pressures the bank faced to reduce its real estate debt. He believed that the bank representatives he met with were not interested in resolving the issue in a manner that would help Perkins Rowe survive. He believed that they were concerned with the bank's survival. He had considered filing bankruptcy to protect Perkins Rowe, but his attorneys advised against it. Throughout this time the Schwegmann family members continued to own 50% of Perkins Rowe I. Mr. Spinosa kept them informed of the financial issues and discussed possible alternative solutions with them.

On June 7, 2011, the District Court dismissed Perkins Rowe's affirmative defenses and the remainder of its counterclaims as a sanction for discovery abuses. KeyBank, No. 09-497-JJB-SCR, 2011 U.S. Dist. LEXIS 61161 (M.D. La. June 7, 2011). On August 8, 2011, the District Court granted summary judgment in KeyBank's favor on its right to foreclose and to enforce the guaranty. KeyBank, No. 09-497-JJB-SCR, 2011 U.S. Dist. LEXIS 87564 (M.D. La. Aug. 8, 2011). After the summary judgment in KeyBank's favor, two counts of KeyBank's complaint on issues separate from the foreclosure and guaranty remained

**[*19]** unresolved. Accordingly, the District Court delayed its final judgment entering it on September 4, 2012, in KeyBank's favor. KeyBank, No. 09-497-JJB-SCR (M.D. La. Sept. 4, 2012). Perkins Rowe filed a writ of mandamus with the Court of Appeals for the Fifth Circuit, which was denied on October 22, 2012. The keeper was released on October 23, 2013. 2590 Associates did not take any enforcement actions to collect on the 2008 note, which would have been futile.

VI.    The Deduction

2590 Associates filed a partnership tax return for 2011 claiming worthless debt deductions of $4,894,890, including $2,926,692 for the 2008 note. Perkins Rowe's accountant recommended deducting the debt. The 2011 partnership return listed Mr. Saban, rather than TLS Investments, as a 15% member and gave him the right to notice as a member. For its 2011 tax year Perkins Rowe I recognized cancellation of indebtedness income of $2,815,652 in connection with the 2008 note. 2590 Associates reported that Mr. Saban, rather than TLS Investments, had a capital account of $1.2 million at the end of 2011. 2590 Associates issued the 2011 Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., to Mr. Saban individually rather than to TLS Investments. Mr. Saban divested his interest in 2015 by selling it to 5615 Associates for a cash payment of $2.8 to $2.9 million. There is no information in the record concerning 2590 Associates'

[*20] activities or financial condition from 2008 through 2015 except for information reported on its 2011 partnership return.

In the FPAA respondent disallowed $2,926,692 of the worthless debt deduction, the amount of the 2008 note. Respondent asserted: "Since the partnership did not establish that the cash transfer was a bona fide loan, the amount has been determined to be a contribution to capital." Respondent did not challenge the year that the debt became worthless in the FPAA or in his answer.

OPINION

Section 166(a) generally allows taxpayers to deduct "any debt which becomes worthless within the taxable year." For a section 166 worthless business debt deduction, taxpayers must show: (1) the deducted amount represents a bona fide debt, (2) the debt became worthless during the year, and (3) the debt was incurred in connection with a trade or business. Sensenig v. Commissioner, T.C. Memo. 2017-1, at *17-*18; sec. 1.166-1(c), Income Tax Regs. Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction allowed by the Code. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Petitioner filed a motion in limine arguing the issue before us should be limited to the existence of a bona fide debt. We held that the issue of whether the

[*21] debt became worthless during 2011 was properly before the Court as respondent raised the issue in his pretrial memorandum. However, we held that the year of worthlessness was a new matter for which respondent would have the burden of proof. See Rule 142. Petitioner bears the burden to establish that the debt was bona fide.

A bona fide debt is a debt that arises from a debtor-creditor relationship on the basis of a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. Whether an advance gives rise to a bona fide debt for Federal tax purposes is determined from all the facts and circumstances. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). To constitute a bona fide debt, at the time of the transfer there must be a real expectation of repayment and an intent on the part of the purported creditor to secure repayment. Haag v. Commissioner, 88 T.C. 604, 616 (1987), aff'd without published opinion, 855 F.2d 855 (8th Cir. 1988); Andrew v. Commissioner, 54 T.C. 239, 245 (1970). Where the facts indicate that no bona fide debt was created, an advance may properly be classified as a contribution to capital. See Davis v. Commissioner, 69 T.C. 814, 835-836 (1978); Rutter v. Commissioner, T.C. Memo. 2017-174. Contributions to capital may not be deducted under section 166. Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income

**[*22]** Tax Regs. Generally, shareholders place their money at the risk of the business while lenders seek a more reliable return. See Midland Distribs., Inc. v. United States, 481 F.2d 730, 733 (5th Cir. 1973).

Whether a transfer of funds constitutes a loan may be inferred from objective characteristics surrounding the transfer. The Court of Appeals for the Fifth Circuit, to which this case is appealable, considers 13 nonexclusive factors to determine whether a bona fide debt exists: (1) the names given to the certificates evidencing the indebtedness, (2) a fixed maturity date, (3) the source of repayment, (4) a legally enforceable right of repayment, (5) the creditor's right to participate in the debtor's management, (6) the subordination of the obligation to other debts, (7) the intent of the parties, (8) the debtor's capitalization and use of the funds, (9) the identity of interest between creditor and stockholder, (10) the payment of interest, (11) the corporation's ability to obtain loans from outside lending institutions, (12) the extent to which the advance was used to acquire capital assets, and (13) the failure of the debtor to repay on the due date or to seek a postponement. See Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972). The factors are not of equal importance, and no single factor is determinative. See Dillin v. United States, 433 F.2d 1097, 1100 (5th Cir. 1970);

**[\*23]** <u>Segel v. Commissioner</u>, 89 T.C. 816, 827 (1987).  Some factors may not be relevant in a given situation.  <u>Estate of Mixon</u>, 464 F.2d at 402.

The object of the inquiry is not to count the factors but to evaluate them.  <u>Tyler v. Tomlinson</u>, 414 F.2d 844, 848 (5th Cir. 1969).  The factors aid in our determination of whether the parties intended to create indebtedness with a reasonable expectation of repayment and whether that expectation comported with economic reality.  <u>See</u> <u>Estate of Mixon</u>, 464 F.2d at 407.  The Court of Appeals for the Fifth Circuit recognizes that the "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice."  <u>Id.</u> at 402-403.  We apply special scrutiny to transactions between entities in the same corporate family or with shared ownership.  <u>See</u> <u>Kean v. Commissioner</u>, 91 T.C. at 594; <u>Malone & Hyde, Inc. v. Commissioner</u>, 49 T.C. 575, 578 (1968); <u>Vinikoor v. Commissioner</u>, T.C. Memo. 1998-152.

Respondent has conceded that the Saban loan was bona fide; i.e., the cash transfer from Mr. Saban to Perkins Rowe created a bona fide debt between Mr. Saban and Perkins Rowe.  The debt was evidenced by three promissory notes with fixed maturity dates.  Each note provided for an interest charge, increased the interest rate upon default, and provided for the payment of attorney's fees for any

**[*24]** collection actions. Upon default, Mr. Saban negotiated with Perkins Rowe to ensure repayment, first by extending the maturity date for one year (the 2007 note) and a second time by again extending the maturity date (the 2008 note) after which he transferred the note to 2590 Associates as a capital contribution, placing the risk of the debt with the company.

Respondent argues that the transfer of the 2008 note to 2590 Associates did not create a bona fide debtor-creditor relationship between Perkins Rowe and 2590 Associates.[3] Rather, he argues that Mr. Saban's receipt of the interest in 2590 Associates satisfied the Saban loan, citing State contract law. He argues that Perkins Rowe and Mr. Saban entered into a contract to modify and extinguish the Saban loan through the transfer of an interest in 2590 Associates. According to respondent, the parties to the Saban loan, including Mr. Spinosa by his own testimony, viewed Mr. Saban's receipt of an interest in 2590 Associates as satisfaction of Perkins Rowe's debt to Mr. Saban. In addition, he argues that there was no transfer of funds between Perkins Rowe and 2590 Associates that could create a debt.

---

[3]Although the FPAA mentions only a "cash transfer" (presumably referring to the cash transfer from Mr. Saban to Perkins Rowe), respondent's answer denies that there was a bona fide debt between 2590 Associates and Perkins Rowe. Accordingly, the issue of the existence of a bona fide debt between Perkins Rowe and 2590 Associates is properly before the Court.

[*25] We find that Mr. Saban entered into a legitimate debt with Perkins Rowe and transferred the debt to 2590 Associates. Mr. Saban's transfer of the debt to 2590 Associates did not negate the legitimacy of the debt. While the transaction may not have been typical of a normal business relationship because of Mr. Spinosa's personal relationship with Mr. Saban, it was a transfer of a legitimate debt. Although Perkins Rowe had failed to make the November and December interest payments on the construction loan at or around the time it executed the 2008 note, respondent did not argue that Perkins Rowe was insolvent at the time of the 2008 note. The January 2008 appraisal indicated that Perkins Rowe had a significant amount of equity in the project. By late 2008 construction neared completion. Retail tenants were in place, and condos were sold. Mr. Spinosa believed Perkins Rowe was 90 days from making the required payments on the construction loan. He continued to negotiate with Perkins Rowe's lenders and to seek refinancing. He remained optimistic that the Perkins Rowe development would be successfully completed.

We recognize that Perkins Rowe was less than seven months from a foreclosure lawsuit and arguably Mr. Saban received a windfall by exchanging his debt for an equity interest in 2590 Associates. An unrelated third party may not have accepted the 2008 note at its face value as a capital contribution as 2590

[*26] Associates did. However, respondent has not argued that the value of the 2008 note should have been discounted when Mr. Saban contributed it to 2590 Associates. Nor has he raised any arguments relating to 2590 Associates' adjusted basis in the 2008 note. Rather, he argues that there was a complete lack of a bona fide debt. 2590 Associates made a business decision, likely influenced by personal relationships, to give Mr. Saban an ownership interest in exchange for the face value of the 2008 note, i.e., the principal of the Saban loan and the accrued, unpaid interest. Mr. Spinosa expressed the intent in the July 2008 memorandum to "satisfy the debt" to Mr. Saban. However, we find that the transaction postponed the need for Perkins Rowe to repay the debt; it did not discharge the debt. It allowed Perkins Rowe to delay repayment of the debt under the extended maturity date to a time when Mr. Spinosa believed Perkins Rowe would be economically viable. Each option in the July 2008 memorandum was a means to delay repayment of the Saban loan rather than to cancel the debt.[4]

Respondent attempts to characterize the options in the July 2008 memorandum, including the offer of an investment opportunity in 2590 Associates, as being made by Perkins Rowe. However, it was Mr. Spinosa who

_____

[4]Respondent raises an issue with the fact that the July 2008 memorandum mentioned the transfer of a note only with respect to the hotel venture. We do not find this fact dispositive.

[*27] made the offer in the July 2008 memorandum. Perkins Rowe did not own 2590 Associates and could not offer an ownership interest in it to satisfy the Saban loan. The purpose of the July 2008 memorandum was to provide alternatives to the immediate repayment of the Saban loan. Four of the five options in the memorandum included the transfer of an ownership interest in a real estate project unrelated to Perkins Rowe. The fifth option was to extend the maturity date of the 2007 note and to lower the interest rate. Mr. Saban wanted to be repaid, or at the least, he no longer wanted to have his money at risk in the Perkins Rowe development. He viewed the Rouzan property as an attractive investment opportunity because of the recent success with rezoning the property for significantly more homes.

Respondent further argues that 2590 Associates did not intend to collect on the debt. We disagree. Had Perkins Rowe become economically viable, 2590 Associates would have collected on the debt. We find Mr. Spinosa's testimony to be credible on this point.

Lastly, we consider respondent's concerns with the relationship between Perkins Rowe and 2590 Associates. Perkins Rowe and 2590 Associates had common management, Mr. Spinosa, and common, related owners. However, they did not have identity of ownership because the Schwegmann family owned 50% of

[*28] Perkins Rowe I, the only named debtor on the 2008 note.[5] The Spinosa Class Trust owned 90% of 2590 Associates but only 5% of Perkins Rowe I. Thus, the Spinosa Class Trust increased its risk on the debt. Mr. Spinosa owned 45% of Perkins Rowe I. This fact alone does not negate our finding that Mr. Saban transferred a legitimate debt to 2590 Associates. Mr. Spinosa had intermingled funds of his various real estate projects owned through different entities in the past. Even with Perkins Rowe, he injected $15 million into the development from a separate real estate deal when Perkins Rowe needed capital in late 2007.

Under the 13 factors considered by the Court of Appeals for the Fifth Circuit, we find that a bona fide debt existed between Perkins Rowe and 2590 Associates. Respondent did not address the 13 factors used by the Court of Appeals. 2590 Associates held a promissory note with a fixed maturity date and accrued interest at an above-market rate. The interest rate increased upon default, and the note provided for an award of attorney's fees for any collection actions. We find that at the time of the 2008 note's transfer, 2590 Associates intended to collect the debt from Perkins Rowe. Mr. Spinosa believed that Perkins Rowe would succeed and would repay the debt. 2590 Associates had the right to enforce

---

[5]Perkins Rowe II did not execute the 2008 note; the reason is unclear from the record. Mr. Spinosa owned 90% of Perkins Rowe II.

[*29] payment. However, as the note was unsecured, collection attempts would have been futile. Mr. Spinosa credibly testified that he believed the Perkins Rowe development could be successful at the time Mr. Saban contributed the note to 2590 Associates and even after the foreclosure case's filing. Mr. Spinosa had extensive experience in real estate investments, and he was optimistic that Perkins Rowe would be successful despite the difficulties it encountered. The source of repayment was not limited to Perkins Rowe's income. There is no evidence of a thin capitalization. In fact, the 2008 appraisal performed for KeyBank indicated that there was substantial equity in Perkins Rowe. The 2008 note was not given to acquire capital assets. Each of these factors weighs in favor of the existence of a bona fide debt.

Two factors weigh against a bona fide debt, the note's subordination to secured creditors and Perkins Rowe's failure to repay the debt and accrued interest. Finally, two remaining factors for us to address are Perkins Rowe's ability to obtain outside loans and the nature of the relationship between 2590 Associates and Perkins Rowe. We find both factors to be neutral in the light of the other factors supporting the existence of a bona fide debt. By the time of the 2008 note's execution, Perkins Rowe had been attempting to refinance the construction loan for nearly one year. Ultimately, the loan was not refinanced, and the property

[*30] was foreclosed on. However, at the time of the 2008 note and even after the foreclosure case began, Mr. Spinosa believed he could work out a refinancing and continued to negotiate with lenders and potential investors. Mr. Spinosa was able to amend the terms of the construction loan agreement in 2008, and all but one lender agreed to a refinancing deal after the foreclosure began. Nor do we find the relationship between Perkins Rowe and 2590 Associates, discussed infra, to negate the other factors supporting a bona fide debt. On the basis of the Court of Appeals for the Fifth Circuit's 13 factors, we find that the debt between Perkins Rowe and 2590 Associates was bona fide.

## II. Satisfaction of Debt Under State Law

Both parties rely on State law to support their respective positions. The form of the instrument or its validity under State law does not control its treatment for Federal tax purposes. United States v. Snyder Bros. Co., 367 F.2d 980 (5th Cir. 1966); W.O. Covey, Inc. v. Commissioner, T.C. Memo. 1969-273. The issues for Federal tax purposes are whether the parties intended to create a bona fide debt and whether the intention comports with economic reality. Estate of Mixon, 464 F.2d at 407. Nevertheless, we briefly address the parties' positions.

Respondent argues that Perkins Rowe and Mr. Saban entered into a valid contract under Louisiana law to satisfy and extinguish the Saban loan. He cites

**[*31]** four requirements for a valid contract under Louisiana law: (1) the parties' capacity to contract, (2) their mutual consent, (3) a cause or reason for the parties to obligate themselves, and (4) a lawful object of the contract. Leger v. Tyson Foods, 670 So. 2d 397, 401 (La. Ct. App. 1996). Respondent argues that there was capacity, consent, cause, and lawful object. He argues that 2590 Associates was a third party rendering performance of the contract by transferring the 15% ownership interest to Mr. Saban, albeit indirectly through TLS Investments, in satisfaction of the Saban loan.[6] See La. Civ. Code Ann. art. 1977 (2018) ("The object of a contract may be that a third person will incur an obligation or render a performance.").

Petitioner argues that the parties must abide by the State law of novation to discharge the Saban loan rather than the requirements of a contract respondent cites. A novation releases a debtor of its liability to a creditor. Id. art. 1879. Under Louisiana law, a novation is defined as "the extinguishment of an existing obligation by the substitution of a new one." Id. Petitioner argues that there was no novation of the debt owed by Perkins Rowe. It argues that there was a

---

[6]The decision to structure the transaction for Mr. Saban to receive indirect ownership in 2590 Associates does not affect the analysis of the transaction.

**[*32]** substitution of promissory notes but the underlying debt continued to exist. Rather, there was a creditor's valid assignment of a promissory note. We agree.

Under Louisiana law,

> Novation takes place when, by agreement of the parties, a new performance is substituted for that previously owed, or a new cause is substituted for that of the original obligation. If any substantial part of the original performance is still owed, there is no novation.
> * * * * * * *
> Mere modification of an obligation, made without intention to extinguish it, does not effect a novation. The execution of a new writing, the issuance or renewal of a negotiable instrument, or the giving of new securities for the performance of an existing obligation are examples of such a modification.

Id. art. 1881. Novation may not be presumed, and "[t]he intention to extinguish the original obligation must be clear and unequivocal." Id. art. 1880. A novation occurs when a new obligor is substituted for a prior obligor who is discharged by the obligee. Id. art. 1882.

Mr. Spinosa's intent for engaging in the transaction was to satisfy Mr. Saban's desire for repayment, which he accomplished by transferring an ownership interest in 2590 Associates to Mr. Saban in exchange for the debt. 2590 Associates received the right to collect the debt, which we have found it intended to do. Mr. Saban did not want to extend the loan's maturity and did not want to have his money at risk with Perkins Rowe. He was aware of Perkins

**[*33]** Rowe's construction problems, cost overruns, and financial condition as Mr. Spinosa kept him informed. Mr. Saban wanted out, and he choose an investment in 2590 Associates to replace the debt owed to him from Perkins Rowe. However, 2590 Associates received a note enforceable under State law. See La. Rev. Stat. § 10:3-104 (2006) (defining requirements for a negotiable instrument).

It is unclear from the record why Perkins Rowe II did not join in executing the 2008 note, and it is possibly because of an oversight by Mr. Saban's attorney. Petitioner argues that Perkins Rowe II's failure to execute the 2008 note with Perkins Rowe I as it had for the prior two notes is inconsequential because it was not a novation. We agree. Perkins Rowe I remained liable for the debt evidenced by the 2008 note. See La. Civ. Code Ann. art. 1885. Furthermore, the 2008 note stated that it was given in substitution for the 2007 note. Perkins Rowe I included the entire amount of the 2008 note as cancellation of indebtedness income for 2011. On the basis of these facts, Perkins Rowe I was not discharged by Mr. Saban, TLS Investments, or 2590 Associates, and there was no novation.

III. Year of Worthlessness

As we have found the debt was bona fide, we turn to respondent's alternative argument that the debt did not become worthless in 2011, the year of the deduction. He argues that the debt was worthless in either 2009, the year the

**[\*34]** foreclosure case began and Perkins Rowe's assets were seized, or 2012, the year of the final judgment in the foreclosure case. He has not argued that the 2008 note did not have any value at the time Mr. Saban contributed it to 2590 Associates in 2008.

For a section 166 deduction, the debt must become worthless during the tax year, i.e., it must have had value at the beginning of the year and become worthless during that year. Milenbach v. Commissioner, 106 T.C. 184, 204 (1996), aff'd in part, rev'd in part on other grounds, 318 F.3d 924 (9th Cir. 2003). A debt's worthlessness is determined by identifiable events that occurred to render the debt worthless during the year. Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 594 (1991). A debt becomes worthless when the taxpayer has no reasonable expectation of repayment. Crown v. Commissioner, 77 T.C. 582, 598 (1981). Some objective factors considered by the Court in determining worthlessness include the value of property securing the debt, the debtor's earning capacity, events of default, the debtor's refusal to pay, actions to collect the debt, any subsequent dealings between the parties, and the debtor's lack of assets. Am. Offshore, Inc. v. Commissioner, 97 T.C. at 594-595. No single factor is conclusive. Id. at 595. The determination of when a debt becomes worthless depends upon the particular facts and circumstances of each case. Riss v.

**[*35]** <u>Commissioner</u>, 56 T.C. 388, 407 (1971), <u>aff'd</u>, 478 F.2d 1160 (8th Cir. 1973). At trial we held that respondent has the burden of proof with respect to the issue of worthlessness in 2011. We find that respondent has failed to satisfy his burden of proof and that the debt became worthless in 2011.

Without question, Perkins Rowe was in serious financial distress in 2009 when KeyBank filed the foreclosure case. However, part of the development was completed, and it generated revenue. Mr. Spinosa believed that Perkins Rowe was 90 days away from making the required payments on the construction loan at the time of the foreclosure case's filing. Perkins Rowe had defaulted on approximately $4 million of interest payments from November 2008 to July 2009 on the $170 million construction loan. Mr. Spinosa continued to negotiate with the lenders and was optimistic a deal could be reached to avoid foreclosure. In fact he came close to a deal with only one creditor holding out. There was a reasonable expectation of repayment at the end of 2009 even though Perkins Rowe ultimately did not receive any income from the seized assets. On the basis of these facts, we find that the debt did not become worthless in 2009.

Nor do we find that the debt became worthless in 2012 as respondent alternatively argues. Rather, we find that the debt became worthless in 2011. That year the GO Zone bonds issued to Perkins Rowe were terminated because of its

[*36] failure to find investors to purchase them. With the termination of the bonds, Mr. Spinosa did not see a viable means to obtain refinancing of the development project. In addition in 2011 Mr. Spinosa's negotiations with KeyBank to avoid foreclosure broke down, and the District Court dismissed Perkins Rowe's counterclaims and affirmative defenses in the foreclosure case. The final judgment in the foreclosure case was delayed to 2012 for resolution of unrelated issues. With these events it was reasonable to abandon hope of recovery on the 2008 note by the end of 2011. We find that the 2008 note had value at the beginning of 2011 and became worthless that year.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.