# United States Tax Court

T.C. Memo. 2023-89

RICHARD JOHN CARDULLA,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 17579-18.                          Filed July 19, 2023.

————————

P engaged in numerous real estate-related activities with respect to which R disallowed his claimed losses and increased his gross income. Among P's activities was the use of a single-member LLC, a disregarded entity, to purchase real estate. In exchange for the real estate, the sellers received from the LLC its secured Note for $1,200,000 with 10% simple interest accruing yearly; with payments of neither principal nor interest due until expiration of the 12-year term of the note. Using the accrual method of accounting, the LLC accrued and deducted interest of $120,000 on account of the Note (no payment of principal had been made).

*Held*: Disallowance of numerous real estate-related deductions sustained for lack of substantiation.

*Held, further*, Note was bona fide indebtedness.

*Held, further*, Note was a debt instrument having original issue discount.

*Held, further*, without a change in method of accounting, LLC could not for examination years accrue interest payments under OID rules.

**Served 07/19/23**

[*2]    *Held, further*, LLC's property was held for long-term appreciation and not in trade or business; interest on Note was investment interest subject to I.R.C. § 163(d) limitation on investment interest.

*Held, further*, increases in capital gain income sustained.

*Held, further*, adjustment to Social Security benefit sustained.

*Held, further*, accuracy-related penalty sustained.

————————

Richard John Cardulla, pro se.

*Jeffrey L. Heinkel, Heather K. McCluskey*, and *Julia Kapchinskiy*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, *Judge*: By Notice of Deficiency dated July 26, 2018 (Deficiency Notice), respondent determined deficiencies in, and accuracy-related penalties with respect to, petitioner's 2014 and 2015 income tax liabilities as follows:[1]

| Year | Deficiency | Accuracy-Related Penalty § 6662(a) |
|---|---|---|
| 2014 | $23,653 | $4,731 |
| 2015 | 44,041 | 8,808 |

Petitioner made federal income tax returns for his taxable (calendar) years 2014 and 2015 on Forms 1040, U.S. Individual Income Tax Return. He included with each return two Schedules C, Profit or Loss From Business, and one Schedule E, Supplemental Income and

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[*3] Loss. The first Schedule C included with each return (Schedule C–1) is with respect to a real estate business named "X-Way Delta, LLC" (X-Way Delta). The second Schedule C included with each return (Schedule C–2) is with respect to an unnamed real estate business.

The questions for decision are as follows.

1. Whether petitioner's Schedules E income from partnerships and S corporations should be increased by $4,241 and $109,755 for 2014 and 2015, respectively?

2. Whether he is entitled to deduct additional Schedule E rental real estate expenses of $5,369 and $8,801 for those years, respectively?

3. Whether he is entitled to deduct Schedule C–2 total expenses of $29,258 and $51,000 for those years, respectively?

4. Whether he is entitled to deduct Schedule C–1 total expenses of $130,869 and $131,593 for those years, respectively?

5. Whether he has unreported capital gain income from Island Mountain, LP (Island Mountain), of $23,655 and $19,170 for those years, respectively?

6. Whether, for 2014, he must include in gross income Social Security benefits of $8,451?

7. Whether, for 2015, he is liable for a section 6662(a) accuracy-related penalty of $8,808?[2]

All other adjustments made by respondent in determining the deficiencies in tax for the years at issue are computational, resulting from the above referenced adjustments. Those computations and adjustments will not be discussed further.

---

[2] Respondent has conceded the accuracy-related penalty that he determined for 2014.

**[\*4]**    Petitioner bears the burden of proof.  *See* Rule 142(a)(1).[3]  With respect to the accuracy-related penalty, respondent bears a burden of production.  *See* § 7491(c).

## FINDINGS OF FACT

*Preliminary Statement*

Before making our findings of fact, we pause to address petitioner's failure to comply with Rule 151, which addresses briefs.  At the conclusion of the trial in this case, we ordered the parties to file briefs, setting a schedule for seriatim briefs, petitioner to open, respondent to answer, and petitioner to reply.  We directed petitioner's attention to Rule 151.  Rule 151(e)(3) requires that an opening brief contain proposed findings of fact in the form of numbered concise statements of essential fact and not a discussion or argument relating to the evidence or the law.  Petitioner's Opening Brief violates the Rule in that petitioner makes 12 proposed findings, virtually none of which are concise statements of essential fact and most of which respondent correctly identifies as comprising legal argument and not statements of fact.

For example, petitioner proposes that we find:

3.  The facts support X-Way Delta's property was not a capital asset under IRC section 1221(a)(1) in that a capital asset does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."  . . .

. . . .

---

[3] Section 7491(a)(1) provides that, if a taxpayer offers credible evidence with respect to any issue relevant to determining his tax liability, the burden of proof with respect to the issue is on the Commissioner.  *See also* Rule 142(a)(2).  Section 7491(a)(1) applies only if the taxpayer complies with the relevant substantiation requirements in the Code, maintains all required records, and cooperates with the Commissioner with respect to witnesses, information, documents, meetings, and interviews.  *See* § 7491(a)(2)(A) and (B).  The taxpayer bears the burden of proving compliance with the conditions of section 7491(a)(2)(A) and (B).  *See, e.g.*, *Mileham v. Commissioner*, T.C. Memo. 2017-168, at \*30.  Petitioner neither proposes facts to support his compliance with the conditions of section 7491(a)(2)(A) and (B) nor persuasively argues that respondent bears the burden of proof on any issues because of section 7491(a)(1).  We therefore conclude that section 7491(a)(1) does not apply in this case.

**[\*5]**    6.    The facts support that the deductions taken by Petitioner were necessary expenses in carrying on his business and were actually paid or accrued in the years in question. . . .

Petitioner's Reply Brief also violates Rule 151(e)(3), which requires that, in a reply brief, a party "set forth any objections, together with the reasons therefor, to any proposed findings of any other party."

Respondent in his Answering Brief proposed 222 findings of fact. In reply, petitioner makes no systematic response. His Reply Brief is a 37-page narrative, initially attacking respondent's attorneys and then comprising what amounts to additional testimony without significant citation of the record interspersed with apparent objections to eight or so of respondent's proposed findings.

Petitioner has not provided us with usable proposed findings of fact. Moreover, because he failed to object to substantially all of respondent's proposed findings, we must conclude that he accepts respondent's unobjected-to proposed findings of fact as correct. *See, e.g.*, *Jonson v. Commissioner*, 118 T.C. 106, 108 n.4 (2002), *aff'd*, 353 F.3d 1181 (10th Cir. 2003).

*Stipulation*

The parties have stipulated certain facts and the authenticity of certain documents. The facts stipulated are so found, and the documents stipulated are accepted as authentic.

*Petitioner*

Petitioner is an attorney. His mailing address was in California when he filed the Petition. He has been involved in real estate activities for many years.

*Real Properties*

The following real properties figure in petitioner's tax returns for 2014 and 2015.

*L Street*—L Street is real property in southeast Washington, D.C. During the years at issue, the property was a vacant lot. Up until sometime before 2014, petitioner was sole owner of the property. During his sole ownership, he installed a fence around the property. The record

[*6] contains two invoices from Long Fence, both dated in February 2006, both for delivery to L Street, both billed to Cardulla Properties, one for the short-term lease of "panels" and the second, for $9,566, for delivery and installation of a chain link fence.

*Plaza Boulevard*—Plaza Boulevard is a real property in National City, California. During the years at issue, it was a vacant lot. Petitioner plans to build a "speculation house" on the lot. The property was not rented during 2014 or 2015.

*Turner Road*—This property is in Bombay, California, next to property owned by X-Way Delta. On the Turner Road property is a house badly damaged by an earthquake. Petitioner has restored the house and uses it as an office and a place to stay when he is visiting the X-Way Delta property. Otherwise, the property is vacant.

*L Street No. 2*—A second property on L Street in southeast Washington, D.C.

*Commercial Street*—A property in San Diego, California.

*Salton Sea Property*—The Salton Sea is a shallow, landlocked, highly saline body of water in southern California. In 1985, petitioner and three others—Scott Hettelsater, Tom Wagner, and Equitable Finance (Equitable)—bought numerous parcels of real estate in proximity thereto (Salton Sea property). Messrs. Hettelsater and Wagner were longtime acquaintances of petitioner. Mr. Wagner was president of Equitable. Initially, each person owned his (its) parcels separately. Petitioner's idea was to develop the Salton Sea property as a mobile home park or hot water spa. He viewed development of the property as his project, in which Messrs. Hettelsater and Wagner and Equitable (Investors) invested. After 20 years of unsuccessful development efforts, the Investors lost heart and wanted to sell their parcels. Petitioner thought he could save the project, and he offered to buy out the Investors, although he told them that he could not then afford to pay cash. Petitioner formed X-Way Delta to purchase parcels from the Investors. Petitioner receives $5,000 a year from a fish farm with an easement that allows the farm's wastewater to pass through an unidentified portion of the Salton Sea property on its way to the sea.

[*7] *Entities*

The following entities figure in petitioner's tax returns for 2014 and 2015.

*Island Mountain*—Island Mountain is a limited partnership of which petitioner was a member.

*X-Way Delta*—X-Way Delta, a single-member limited liability company (LLC) of which petitioner is the member. Petitioner formed X-Way Delta in 2005 as a vehicle by which to make good on his offer to buy out the Investors. X-Way Delta acquired the Investors' interests in 11 of the parcels constituting the Salton Sea property. It acquired those interests (X-Way Delta property) by way of seven individual quitclaim deeds and one grant deed (collectively, Deeds). For an unstated "valuable consideration," each Investor released his (its) interests in certain of the 11 parcels in favor of X-Way Delta. All of the Deeds are dated either December 28 or 29, 2005. None was recorded. Absent from the record is any deed evidencing petitioner's transfer of property to X-Way Delta.

In consideration of the X-Way Delta property, X-Way Delta executed a document styled "Note Secured By Deed of Trust" (Note and Deed of Trust, respectively). The Note is dated December 29, 2005, and states that, for value received, X-Way Delta promises to pay to Equitable and Mr. Hettelsater $1,200,000 "with interest from January 1, 2006, until paid at the rate of 10% per annum." It further states that "the whole sum of principal plus accrued interest" is due and payable on or before January 1, 2018. It states that it is a purchase money mortgage. It concludes that it is secured by a Deed of Trust, "affecting the following parcel numbers [viz, five of the six parcels listed in the Deed of Trust]."

The Deed of Trust is dated January 4, 2006. The parties to it are X-Way Delta, "Trustor"; Chicago Title Co., a California corporation, "Trustee"; and Equitable and Mr. Hettelsater, "Beneficiaries." The Deed of Trust recites that X-Way Delta grants to Chicago Title Co. "in Trust with Power of Sale that property . . . described as," and here are listed 6 of the 11 parcels constituting the X-Way Delta property. The Deed of Trust is recorded.

The record contains no contracts of sale for any parcels constituting the X-Way Delta property. Nor were the parcels appraised before the Deeds were executed or the Note executed. Petitioner

[*8] testified that he and the Investors were "thinking about 1,000 or 1,200 an acre, around that."

X-Way Delta paid no interest during the 12-year term of the Note, nor, when the Note matured in 2018, did it pay the accrued interest or principal. Petitioner claims that, when the Note matured, the creditors extended its term to 2024.

In 2007, petitioner thought he had a buyer for the X-Way Delta property, but the potential sale fell through because of a downturn in the economy.

Petitioner believes that, since 2007, environmental problems in the Salton Sea area have increased. He analogizes the area to the Love Canal. Because of environmental problems, he feels that the doors have shut to development of the X-Way Delta property. He believes that, without a $20,000 tax saving from the deduction of interest accruing on the Note, maintaining the property would be "nonsurvivable." He thinks that the value of the property lies in holding onto it long enough, and then someone will be able to make use of minerals under it and develop it for hydrothermal energy.

X-Way Delta does not maintain books and records.

*Petitioner's Returns and Respondent's Adjustments*

Petitioner's 2014 and 2015 returns are mostly handwritten, and neither return reports any taxable income or tax due. In processing those returns, respondent made numerous mathematical and computational corrections. One notable feature of both returns is that, on both, petitioner claims the same deduction for an X-Way Delta loss twice, on separate schedules. For 2014, petitioner claimed an X-Way Delta loss of $125,869 on both Schedule C–1 and on Schedule E, Part II. For 2015, he did likewise with respect to an X-Way Delta loss of $126,593. He testified that he did so because he did not know the difference between an S corporation and a single-member LLC.

*Schedule E—Island Mountain and X-Way Delta*

Petitioner's returns for 2014 and 2015 both include a Schedule E. Part I of Schedule E is for reporting income or loss from rental real estate and royalties, and Part II is for reporting income or loss from partnerships and S corporations. Petitioner listed two pass-through entities in Part II of each Schedule E, Island Mountain and X-Way

[*9] Delta, which petitioner mistakenly identified as an S corporation but which, as found, is a single-member LLC.[4]

Island Mountain issued petitioner for 2014 a corrected Schedule K–1 (Form 1065), Partner's Share of Income, Deductions, Credits, etc., reporting $4,241 of ordinary income and $23,655 of long-term capital gain. It issued him for 2015 a Schedule K–1 reporting $2,332 of ordinary income and $19,170 of long-term capital gain. Respondent determined that petitioner had not reported the ordinary income amounts from those schedules and increased his Schedule E, Part II income for each year accordingly.

As stated, petitioner reported a loss from X-Way Delta of $126,593 on his 2015 Schedule E, Part II. He also reported there his Island Mountain long-term capital gain of $19,170. Netting the two amounts ($19,170 − 126,593 = $−107,423), he reported a Part II loss of $107,423 (Part II loss). On Part I of his 2015 Schedule E, he reported a net gain of $63,226. Subtracting his Part I gain of $63,226 from his Part II loss of $107,423 results in a difference of $44,197 or, in other words, a 2015 Schedule E loss of $44,197. Petitioner should have carried that loss to the front page of his 2015 Form 1040 and entered it on line 17 (where Schedule E gain or loss is included in the computation of total income). But he did not, leaving line 17 blank. In processing petitioner's 2015 return, respondent corrected for petitioner's omission of a line 17 amount. He entered into his computers −$44,197 as the amount that should have been reported as a 2015 Schedule E loss on line 17.

Subsequently, in determining a deficiency in petitioner's tax for 2015, respondent adjusted petitioner's income by disallowing the 2015 Schedule E, Part II loss of $107,423, presumably on the grounds that, X-Way Delta being a disregarded entity, Schedule E, Part II, reporting was inappropriate for any X-Way Delta loss and Island Mountain's capital gain should have been reported on Schedule D, Capital Gains and Losses.[5] Respondent's disallowance of the Part II loss exactly offset

---

[4] Thus, we assume that, pursuant to Treasury Regulation § 301.7701-3(b), X-Way Delta is disregarded as an entity separate from its owner. For tax purposes, X-Way Delta's business is treated as a proprietorship of which petitioner is considered the proprietor. *E.g.*, *Brown v. Commissioner*, T.C. Memo. 2014-167, at *3.

[5] That explanation would appear to justify only reclassifying the $107,423 loss as a 2015 Schedule C loss of $126,593 and a 2015 Schedule D gain of $19,170, rather than disallowing the loss altogether. Such reclassification was unnecessary for the $126,593 loss from X-Way Delta because petitioner had already reported that loss for

[*10] the inclusion of that loss in the Schedule E amount that respondent treated petitioner as erroneously having omitted from line 17. Accompanying the Deficiency Notice is Form 5278, Statement– Income Tax Changes. The amount of the 2015 Schedule E adjustment for partnership and S corporation gains and losses is positive $109,755, which is the sum of the disallowed Part II loss of $107,423 and the omitted $2,332 of Island Mountain ordinary income from the corrected Schedule K–1.[6]

*Schedule E—Rental Real Estate*

On his 2014 and 2015 Schedules E, Part I, petitioner listed five rental properties: L Street, Plaza Boulevard, Turner Road, L Street No. 2, and Commercial Street.

For neither year did he report any rents (or other income) from the first three properties. He reported total expenses for the five properties of $84,865 and $77,113 for those years, respectively. Of those sums, $20,405 and $15,290 were the expenses allocable to the first three properties. The following Tables 1 and 2 detail what petitioner reported for 2014 and 2015 for those three properties.

---

second time on his 2015 Schedule C–1. As to the misreported $19,170 Island Mountain long-term capital gain, respondent removed it from Schedule E and made a positive adjustment to petitioner's 2015 Schedule D income in a like amount.

[6] For 2014, petitioner also reported on Schedule E, Part II, an Island Mountain long-term capital gain ($23,655) and an X-Way Delta loss ($125,869) for the net Part II loss of $102,214. Petitioner had a Part I gain of $36,468, which, when added to the Part II loss of $102,214, produced a Schedule E loss of $65,746, which petitioner *did* enter on line 17 of his 2014 Form 1040. In processing petitioner's 2014 return, respondent disregarded the Part II loss as a component of petitioner's line 17 Schedule E amount, entering into his computer only the Part I gain of $36,468. He then had no need to disallow the Part II loss because he had disregarded it, and his Schedule E adjustment for 2014 includes only the unreported Island Mountain ordinary income amount of $4,241. As with 2015, petitioner had reported the $125,869 X-Way Delta loss for a second time on his 2014 Schedule C–1. Respondent increased petitioner's Schedule D income by $23,655 on account of the Island Mountain long-term capital gain.

**[*11]** *Table 1*

| 2014 | | | |
|---|---|---|---|
| | *L Street* | *Plaza Boulevard* | *Turner Road* |
| **Income:** | | | |
| Rents received | — | — | — |
| **Expenses:** | | | |
| Legal and professional fees | | | $350 |
| Repairs | | $500 | 6,000 |
| Taxes | | 222 | 859 |
| Utilities | | | 224 |
| Depreciation | $2,443 | 1,014 | 8,793 |
| Total expenses | $2,443 | $1,736 | $16,226 |
| **Loss:** | ($2,443) | ($1,736) | ($16,226) |

*Table 2*

| 2015 | | | |
|---|---|---|---|
| | *L Street* | *Plaza Boulevard* | *Turner Road* |
| **Income:** | | | |
| Rents received | — | — | — |
| **Expenses:** | | | |
| Repairs | | $1,000 | $600 |
| Taxes | | 231 | 861 |
| Utilities | | | 348 |
| Depreciation | $2,443 | 1,014 | 8,793 |
| Total expenses | $2,443 | $2,245 | $10,602 |
| **Loss:** | ($2,443) | ($2,245) | ($10,602) |

Respondent disallowed any deduction for those expenses for lack of substantiation and on the grounds that the properties were not rental properties.

[*12] As explained below, respondent also disallowed a deduction for the expenses petitioner reported on the Schedules C–2 but allowed some of those expenses as additional expenses on the Schedules E, Part I. The following Table 3 shows the resulting allowance of Schedule E, Part I, expenses.

*Table 3*

| | Year | 2014 | 2015 |
|---|---|---|---|
| 1. | Rental expenses claimed on Schedule E, Part I | $84,865 | $77,113 |
| 2. | Disallowed Schedule E, Part I, expenses | (20,405) | (15,290) |
| 3. | Additional Schedule E, Part I, expenses from Schedule C–2 | 25,774 | 24,091 |
| 4. | Schedule E, Part I, expenses allowed | $90,234 | $85,914 |
| 5. | Schedule E, Part I adjustment to taxable income (line1–line 4) | ($5,369) | ($8,801) |

*Schedule C–2: Real Estate Business*

Petitioner's Schedules C–2 state that they relate to a real estate business of his. On the 2014 Schedule C–2, petitioner did not specify an accounting method. On the 2015 Schedule C–2, he checked the box "Accrual." The following Table 4 shows petitioner's Schedules C–2 reporting of income, expenses, and net profits.

[*13]                        *Table 4*

|                        | *2014*    | *2015*    |
|------------------------|-----------|-----------|
| Income                 | $36,000   | $51,000   |
| Tentative expenses     | (29,258)  | (25,285)  |
| Tentative profit       | 6,742     | 25,715    |
| Home office expense    | -0-       | (25,715)  |
| Net profit             | $6,742    | $0        |

For 2015, petitioner intended to claim no home office expense deduction. In error, however, he entered, $25,715, his 2015 tentative profit, on the line for reporting a home office expense and left blank the line to report his 2015 net profit. In processing his 2015 return respondent netted his reported home office expense against his tentative profit and treated the difference—zero—as his 2015 Schedule C–2 income.

Respondent disallowed all of petitioner's Schedule C–2 expenses for both 2014 and 2015 on the grounds that petitioner had not shown that he had incurred the expenses or, if he had, that they were paid during the taxable year for ordinary and necessary business purposes. To effect that disallowance, respondent increased petitioner's reported Schedule C–2 income by $29,258 and $51,000 for 2014 and 2015, respectively. [7]

Additionally, believing that, for each year, petitioner had misreported the expenses from rental real estate on Schedule C–2, respondent, for each year, moved a portion of those expenditures to the year's Schedule E, Part I. Respondent began with the total expenses petitioner had reported on each Schedule C–2, $29,258 and $51,000, for 2014 and 2015, respectively. He reduced each total by the amount of depreciation claimed—$3,484 and $1,194, respectively—and, for 2015, the home office expense of $25,715. The resulting differences are the

---

[7] Petitioner conceded at trial that he had no home office expense for 2015.

[*14] amounts shown on the following Table 5, which he allowed as Schedule E, Part I, expenses. *See supra* Table 3.

*Table 5*

|  | *2014* | *2015* |
|---|---|---|
| Total expenses | $29,258 | $51,000 |
| Depreciation | (3,484) | (1,194) |
| Home office expense | -0- | (25,715) |
| Difference | $25,774 | $24,091 |

The depreciation expenses reported on the 2014 and 2015 Schedules C–2 relate to a computer, a small trailer, a backhoe, and a scooter, as evidenced by depreciation schedules petitioner provided.

Respondent made no adjustments to the Schedule C–2 income amounts petitioner reported, which, at trial and on brief, petitioner admits were gross income from Island Mountain and from his other real estate activities.

*Schedules C–1: X-Ray Delta*

For each of 2014 and 2015, petitioner's Schedule C–1 identifies X-Way Delta as the relevant business and reports that X-Way Delta uses the accrual method of accounting. The schedules report income, expenses and profit or loss as follows.

**[\*15]**                                    *Table 6*

|                               | *2014*       | *2015*        |
|-------------------------------|--------------|---------------|
| **Income:**                   |              |               |
| Gross receipts                | $5,000       | $5,000        |
| **Expenses:**                 |              |               |
| Mortgage interest             | 120,000      | 120,000       |
| Legal and professional services | 5,000     | 5,000         |
| Office expense                | 120          | 100           |
| Taxes and licenses            | 3,422        | 3,997         |
| Travel                        | 1,326        | 1,440         |
| Utilities                     | 496          | 501           |
| Other                         | 505          | 535           |
| **Total expenses**            | $130,869     | $131,593[8]   |
| **Income (loss):**            | ($125,869)   | ($126,593)    |

Petitioner identified the $5,000 of gross receipts for each year as payment from the fish farm for its easement.

Claiming that petitioner had not shown that either year's Schedule C–1 expenses were incurred or, if incurred, were paid during the taxable year for ordinary and necessary business purposes, respondent disallowed deductions for all the reported expenses, increasing petitioner's taxable income by $130,869 and $131,593 for 2014 and 2015, respectively.

*Capital Gains*

Respondent made positive adjustments of $23,655 and $19,170 to petitioner's gross income for 2014 and 2015, respectively, to account for the long-term capital gains reported to petitioner on the Island Mountain Schedules K–1.

---

[8] The sum of total expense is $131,573, and income should be $126,573. The parties can correct for those errors during the Rule 155 computations.

[*16] *2014 Social Security Benefit*

Petitioner reported on his 2014 return a taxable Social Security benefit of $9,942. In processing petitioner's return, respondent disregarded that entry because he believed that petitioner had computed his taxable Social Security benefit erroneously. Respondent treated petitioner as having reported zero benefit. In his adjustments to petitioner's 2014 income, respondent made a positive adjustment of $8,451 for Social Security benefits received.

*Penalty Approval*

Revenue Agent (RA) Keith Kawamoto conducted respondent's examination of petitioner's 2014 and 2015 returns. He prepared a penalty approval form that included a section 6662 accuracy-related penalty for 2014 attributable to both petitioner's negligence and his substantial understatement of income tax. RA Kawamoto's acting direct supervisor, Ella Chernyak, signed the penalty approval form on June 26, 2017, which was before respondent issued the Deficiency Notice.

OPINION

I.     *Schedule E—Island Mountain and X-Way Delta*

A.     *Island Mountain*

Respondent would increase petitioner's gross income by $4,241 and $2,332 for 2014 and 2015, respectively, on account of those amounts' being reported to petitioner as his distributive shares of Island Mountain's ordinary income for those years.

At trial, in response to the Court's question whether petitioner saw any error in the positive adjustment of $4,241 for 2014, he answered "no." Nevertheless, petitioner argues on brief that the adjustment is improper because he *did* report that income on his 2014 return. Petitioner reported a profit of $6,742 on his 2014 Schedule C–2. He claims that the $10,983 that he entered on the first page of his 2014 Form 1040, line 12, "Business income or (loss)," was the sum of his distributive share from Island Mountain, $4,241, and his Schedule C–2 profit, $6,742.

Petitioner did not net his 2014 Schedule C–1 and C–2 profits and losses before entering an amount on Form 1040, line 12. When $6,742

**[*17]** is subtracted from the amount he did enter on line 12, $10,983, the difference is $4,241. The coincidence between that difference and respondent's same adjustment for unreported income from Island Mountain leads us to accept petitioner's explanation that he reported that income along with his Schedule C–2 profit on line 12, and we so find. We do not sustain respondent's adjustment in that amount.

For 2015, petitioner claims that the $51,000 of gross income that he reported on the 2015 Schedule C–2 included not only his $35,000 annual fee as general partner of Island Mountain but also his $2,332 distributive share of its ordinary income. For 2015, it would be quite the coincidence if the $35,000 annual fee, the $2,332 Island Mountain ordinary income, and whatever other amounts are included in the gross income reported on the Schedule C–2 end up being a round $51,000. Petitioner has not convinced us, and we will not disturb respondent's positive adjustment of $2,332.

B. *X-Way Delta*

Because X-Way Delta is not an S corporation (or a partnership), we see no error in respondent's 2015 Schedule E adjustment disallowing the Part II loss of $107,423.

C. *Total Schedule E Adjustments*

Respondent erred in increasing petitioner's Schedule E, Part II income by $4,241 for 2014, but he did not err in increasing his Schedule E, Part II income by $109,755 ($2,332 + 107,423 = $109,755) for 2015.

II. *Schedule E—Rental Real Estate: L Street, Plaza Boulevard, Turner Road*

A. *Introduction*

Respondent disallowed any deduction for Table 1 and 2 expenses for lack of substantiation and because the properties were not rental properties.

Section 162(a) "allow[s] as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 212(1) and (2) similarly allows an individual a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of

[*18] income or the management, conservation, and maintenance of property held for the production of income. Section 167(a) "allow[s] as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear . . . (1) of property used in the trade or business, or (2) of property held for the production of income."

A taxpayer must keep books or records that substantiate the expenses underlying each deduction claimed on his or her return. § 6001; *Roberts v. Commissioner*, 62 T.C. 834, 836 (1974). Claiming a deduction on an income tax return is not sufficient to substantiate the underlying expense. *Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979). Rather, an income tax return "is merely a statement of the [taxpayer's] claim . . . ; it is not presumed to be correct." *Roberts*, 62 T.C. at 837. With respect to a deduction for depreciation, "the taxpayer must show that the property was used in a trade or business (or other profit-oriented activity). In addition, the taxpayer must establish the property's depreciable basis, by showing the cost of the property, its useful life, and the previously allowable depreciation." *Cluck v. Commissioner*, 105 T.C. 324, 337 (1995). A depreciation schedule alone is insufficient to substantiate the deduction. *See Holden v. Commissioner*, T.C. Memo. 2015-131, at *65–66.

Under *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930), if a taxpayer claims a deduction but cannot fully substantiate the underlying expense, the Court in certain circumstances may approximate the allowable amount, "bearing heavily if it [so] chooses upon the taxpayer whose inexactitude is of his own making." The Court must have some factual basis for its estimate, however, else the allowance would amount to "unguided largesse." *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957); *accord Eze v. Commissioner*, T.C. Memo. 2022-83, at *5–6.

B.    *Discussion*

We start and end with the question of whether petitioner has substantiated the Table 1 and 2 expenditures for which he has claimed deductions. He has not. Putting aside depreciation for the moment, the remaining expenditures in the table are legal and professional fees, repairs, taxes, and utilities. Petitioner has failed to direct us to material in the record substantiating those expenditures—i.e., to whom paid, for what purpose, when paid, what evidence of payment, and the like. Nor has petitioner provided a factual basis from which, pursuant to *Cohan*, we could approximate the amount of any of those expenditures.

[*19] Petitioner has failed to carry his burden of proof. For failure of substantiation, we sustain respondent's disallowance of any deduction for the four described Table 1 and 2 expenditures.

For similar reasons, we disallow any deduction for the depreciation deductions on Tables 1 and 2. For each of 2014 and 2015, petitioner claimed for L Street a depreciation deduction of $2,443. We are satisfied that in 2006, petitioner paid $9,566 to install a fence around the property. Petitioner has pointed us to no evidence of any other expenditure for a depreciable improvement to the property. And with respect to the 2006 expenditure, petitioner has failed to show that any depreciable basis remained to be claimed for either 2014 or 2015.

With respect to Plaza Boulevard and Turner Road, petitioner attached to his 2014 and 2015 returns schedules that purport to show the computation of the depreciation claimed for each of those properties. And while the computations for Plaza Boulevard match the amounts on Tables 1 and 2, petitioner has failed to explain what property was depreciable with respect to Plaza Boulevard, which we have found to have been a vacant lot during the years at issue. With respect to Turner Road, the schedules show for each year total depreciation of $2,038, yet, on his returns, as shown on Tables 1 and 2, petitioner reported $8,793 of depreciation. And while there may be property subject to depreciation on the Turner Road property, petitioner has failed to propose facts from which we could find its cost, useful life, and the remaining recoverable basis during the years at issue. He has failed to prove his entitlement to any depreciation deduction for either Plaza Boulevard or Turner Road for either of the years at issue, and we sustain respondent's disallowance of any deduction.

III.    *Schedule C–2 Expenses*

As shown on Table 4, petitioner reported tentative Schedule C–2 expenses of $29,258 and $25,285 for 2014 and 2015, respectively. Respondent disallowed any Schedule C–2 deduction for those expenses but allowed portions, $25,774 and $24,091, for those years, respectively, as Schedule E, Part I expenses. *See supra* Tables 3 and 5. Respondent disallowed the differences, $3,484 and $1,194, as unsubstantiated depreciation expenses. Petitioner has no objection to respondent's first action but contests respondent's disallowance of the depreciation deductions. Petitioner has presented depreciation schedules for each year that list a computer, a small trailer, a backhoe, and a scooter, and, for each item, purport to show the date purchased, the cost, prior

**[\*20]** depreciation, method of depreciation, useful life, and the year's claimed depreciation. He has not, however, pointed us to evidence in the record corroborating the unsubstantiated figures asserted on those schedules. We will not disturb respondent's disallowance of the Schedule C–2 depreciation deductions. *See, e.g., Anyanwu v. Commissioner*, T.C. Memo. 2014-123, at \*28–29 (sustaining the Commissioner's disallowance of a taxpayer's depreciation deduction where the taxpayer did not provide any testimony or other evidence at trial to explain the numbers appearing on the depreciation schedule filed with her return).

Respondent did not err in increasing petitioner's reported 2014 Schedule C–2 income by $29,258 and, considering petitioner's error in claiming a $25,715 deduction for the business use of his home, respondent did not err in increasing his 2015 reported Schedule C–2 income by $51,000.

IV. *Schedule C–1 Expenses*

A. *Introduction*

Respondent disallowed petitioner's Schedule C–1 expense deductions of $130,869 and $131,593 for 2014 and 2015, respectively, on the grounds that petitioner had not shown that expenses were incurred or, if incurred, were paid during the taxable year for ordinary and necessary business purposes.

B. *Interest Expense*

1. *Introduction*

The largest of the disallowed expense deductions is an interest expense of $120,000 for each year. The Note obligated X-Way Delta to pay Equitable and Mr. Hettelsater principal of $1,200,000 plus accrued interest (10% per annum) on or before January 1, 2018.

Section 163(a) "allow[s] as a deduction all interest paid or accrued within the taxable year on indebtedness." There is an exception to this general rule. Section 163(h)(1) provides that in the case of a taxpayer other than a corporation, no deduction shall be allowed for personal interest which is paid or accrued during the tax year. Personal interest does not include interest allocable to a trade or business, investment interest, or interest taken into account in computing gain or loss from a passive activity (passive activity interest). § 163(h)(2). The amount

**[\*21]** allowed as a deduction for investment interest for any tax year shall not exceed the net investment income of the taxpayer for the taxable year. § 163(d)(1). Passive activity interest is taken into account in determining passive activity losses, the deduction of which is limited to passive activity income. *See* § 469(a)(1), (d)(1).

Section 163(e) addresses debt instruments issued with original issue discount (OID) and provides that the issuer of a debt instrument with OID is allowed a deduction for the taxable year equal to the aggregate daily portions of the OID.

Respondent argues that petitioner may not deduct the interest accrued on the Note because the interest did not accrue on a bona fide loan and, if it did, the X-Way Delta property was held for investment and, thus, petitioner's deductions were limited. Petitioner answers in rebuttal that the Note evidenced a bona fide loan, that the interest was incurred in his trade or business, and that interest accrued on real estate you own is deductible: "If you use the accrual method of accounting, you can deduct interest over the period it accrues, regardless of when you pay it."

2. *Bona Fide Loan*

"A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Treas. Reg. § 1.166-1(c). "Whether an advance gives rise to a bona fide debt for Federal tax purposes is determined from all the facts and circumstances." *2590 Assocs., LLC v. Commissioner*, T.C. Memo. 2019-3, at \*21. Where the facts indicate that no bona fide debt was created, an advance may indicate some other relationship between the alleged debtor and creditor. For example, an advance to a corporation may properly be classified as a contribution to capital, *see, e.g.*, *Davis v. Commissioner*, 69 T.C. 814, 835 (1978), or an advance to a family member may actually be a gift, *see, e.g.*, *Bragg v. Commissioner*, T.C. Memo. 1993-479, 1993 WL 413014, at \*14.

The objective factors here indicate that the Note constituted bona fide debt. By its own terms, it is a promise to pay money. It provides that, "for value received," the maker, X-Way Delta promises to pay two named persons a fixed sum, along with interest, on or before a date certain. It is secured by the Deed of Trust. And although it was not paid on the last date prescribed for payment, petitioner testified without contradiction that the creditors had extended the due date. In any

[*22] event, validity of debt is determined upon issuance. If the Note was valid debt when issued, the failure to pay principal upon maturity, even without extension of the due date, would not have caused the debt to be invalid.

We have said that the objective of the inquiry into the bona fides of a debt is not to count factors but to evaluate them. *2590 Assocs.*, T.C. Memo. 2019-3, at *23. "The factors," we have said, "aid in our determination of whether the parties intended to create indebtedness with a reasonable expectation of repayment and whether that expectation comported with economic reality." *Id.* Equitable and Mr. Hettelsater transferred interests in discernable parcels of real estate to X-Way Delta in consideration of a promise to pay in the future $1,200,000 (plus interest), the whole obligation secured by a deed of trust. We have no idea whether this was a fair exchange or not. Nevertheless, although petitioner and Messrs. Hettelsater and Wagner (president of Equitable) were longtime acquaintances, there is no indication of any family relationship, and respondent has constructed no narrative of X-Way Delta and the Investors contributing the Note and parcels of real estate, respectively, to a joint venture. We conclude, and find, that the Note constituted bona fide debt.

### 3. *Accounting for Interest*

#### a. *Introduction*

Although X-Way Delta had no obligation to pay either interest or principal on the Note before its maturity on January 1, 2018, petitioner reported on the Schedules C–1 for each of 2014 and 2015 an interest deduction of $120,000. Petitioner believed that he had elected an accrual method of accounting for X-Way Delta and that the interest expense for the Note accrued ratably. Apparently, petitioner was not aware of the rules for deducting OID. Because of that failure, we must also be concerned with the rules for changing a method of accounting.

#### b. *OID*

A debt instrument has OID if the stated redemption price at maturity exceeds the issue price. *See* § 1273(a)(1). In general, the term "stated redemption price at maturity" means interest and other amounts payable at maturity other than interest paid periodically at least annually. *See* § 1273(a)(2). Unless there were a prepayment, the

**[\*23]** stated redemption price at maturity of the Note would be $2,640,000 ($1,200,000 + ((0.1 × $1,200,000) × 12) = $2,640,000).[9]

Section 1274 addresses the issue price of certain debt instruments issued for property. The section applies to debt instruments given in consideration for the sale of property if (1) the stated redemption price at maturity exceeds, where there is adequate stated interest, the stated principal amount and (2) payments are due more than six months after the sale or exchange of the property. *See* § 1274(c)(1). Section 1274 provides the issue price of the Note because it was given in consideration for the sale of property and the two further conditions set forth in section 1274(c)(1) are met. To begin with, the Note has adequate stated interest. This is so because the stated principal amount for it—$1,200,000—is less than the imputed principal amount of it—$1,574,700.[10] *See* § 1274(c)(2). Moreover, payments are due more than six months after the sale or exchange of the property. *See* § 1274(c)(1)(B). Because the Note has adequate stated interest, its issue price is the stated principal amount, $1,200,000. *See* § 1274(a)(1).

Subtracting the issue price of the Note—$1,200,000—from the stated redemption prices at maturity—$2,640,000—yields OID of $1,440,000. *See* § 1273(a)(1).

Section 163(e)(1) allows as a deduction to the issuer for any taxable year that portion of the OID with respect to a debt instrument that is equal to the aggregate daily portions of the OID for days during such year.[11] The daily portions of OID are determined under section 1272(a) (without regard to the rules for acquisition premium and de minimis OID). *See* Treas. Reg. §§ 1.163-7, 1.1272-1. Applying a yield to maturity of 6.79114% compounded annually, respondent has calculated OID interest accruals for the Note of $137,850 and $147,211 for 2014

---

[9] Petitioner claimed a deduction for X-Way Delta of $120,000 of accrued interest for each year from 2006 through 2015. That fact supports a finding that the Note called for simple interest at a rate of 10% a year.

[10] The imputed principal amount of the Note is the sum of the present values as of the issue date of all payments, including interest, due under it using a test rate of interest as determined under Treasury Regulation § 1.1274-4. *See* Treas. Reg. § 1.1274-2(c)(2). Compounding annually and using a test rate of 4.40%, *see* Rev. Rul. 2005-66, Table 1 (Long Term), 2005-2 C.B. 686, 687, the imputed principal amount for all payments due under the Note—$2,640,000—is $1,574,700.

[11] There is no indication that the parties to the Note elected under section 1274A(c) to use the cash method.

**[*24]** and 2015, respectively.[12] Pursuant to section 163(e)(1), petitioner would normally be able to deduct those amounts as interest accruals unless limited by the rules addressing investment interest. However, petitioner may not be entitled to deduct the OID accruals of $137,850 and $147,211 for 2014 and 2015 because they exceed the ratable accruals of interest ($120,000 for each year) that X-Way Delta reported.

### c.     *Change in Method of Accounting*

We begin by saying that petitioner has not convinced us that, the OID rules aside, X-Way Delta could use an accrual method of accounting. A taxpayer with two or more separate and distinct trades or businesses may use a different method of accounting for each. *See* § 446(d); Treas. Reg. § 1.446-1(d)(1). Nevertheless, a trade or business will not be considered separate and distinct unless the taxpayer maintains a separable and complete set of books and records for such a

---

[12] Yield to maturity is the discount rate that, when used in computing the present value of the principal and interest payments, produces an amount equal to the issue price of the debt instrument. Treas. Reg. § 1.1272-1(b)(1)(i). Applying that discount rate (6.79114%) to the adjusted issue price (AIP) of the Note at the beginning of each year, respondent determined OID interest accruals for each year as follows (rounded):

| Accrual year | AIP at beginning of year | OID | AIP at end of year |
| --- | --- | --- | --- |
| 2006 | $1,200,000 | $81,494 | $1,281,494 |
| 2007 | 1,281,494 | 87,028 | 1,368,522 |
| 2008 | 1,368,522 | 92,938 | 1,461,460 |
| 2009 | 1,461,460 | 99,250 | 1,560,710 |
| 2010 | 1,560,710 | 105,990 | 1,666,700 |
| 2011 | 1,666,700 | 113,188 | 1,779,888 |
| 2012 | 1,779,888 | 120,875 | 1,900,762 |
| 2013 | 1,900,762 | 129,083 | 2,029,846 |
| 2014 | 2,029,846 | 137,850 | 2,167,695 |
| 2015 | 2,167,695 | 147,211 | 2,314,907 |
| 2016 | 2,314,907 | 157,209 | 2,472,115 |
| 2017 | 2,472,115 | 167,885 | 2,640,000 |
|  |  | $1,440,001 |  |

[*25] trade or business. Treas. Reg. § 1.446-1(d)(2). X-Way Delta did not maintain books and records, and petitioner uses the cash receipts and disbursements method of accounting for his other business activities.[13] It is, therefore, not clear that X-Way Delta is a business separate and distinct from his other businesses, for which petitioner uses the cash method of accounting. Nevertheless, it appears that petitioner has used an accrual method with respect to X-Way Delta for some time, and any change would require the consent of the Commissioner. *See* § 446(e); Treas. Reg. § 1.446-1(e)(2)(i) (expressly bringing a change from an improper or unpermitted method of accounting within the ambit of section 446(e)). Thus, without the Commissioner's permission, petitioner would be precluded from deducting interest accruals on the Note under the OID rules if those deductions exceeded the ratable accruals petitioner had been deducting, which they do. Larger accruals under the OID rules occur towards the end of the term of the Note. Neither has petitioner asked respondent to change X-Way Delta's method of accounting nor has respondent made any change.[14]

### 4.     *Character of the Interest*

The interest accrued in 2014 and 2015 on the Note constitutes either interest allocable to a trade or business, investment interest, passive activity interest, or, if none of the former, personal interest.

A taxpayer may have separate and distinct activities within the same broad category of business. *Resser v. Commissioner*, T.C. Memo. 1991-423. Generally, activities carried out by a taxpayer-owned entity, even a single-member LLC that is a disregarded entity, are viewed as activities separate from the taxpayer's, and the entity is tested on a stand-alone basis to see whether the activities rise to the level of a trade or business. *See, e.g., Conner v. Commissioner*, T.C. Memo. 2018-6, at *26–30 (considering the activities of each of taxpayer husband's four disregarded-entity LLCs on a stand-alone basis and finding that the

---

[13] On the 2014 Schedule C–2, petitioner checked no box indicating any accounting method; on the 2015 Schedule C–2 he checked the accrual box. Apparently, the 2015 Schedule C–2 is in error because, at trial, petitioner testified that the accruals from Schedules C–1, X-Way Delta, were the only accruals on his return.

[14] Assuming that the Note is valid indebtedness, respondent computes a section 481(a)(2) adjustment for 2014 (the earliest open year) increasing X-Way Delta's gross income by $130,154, "representing the sum of the excess deductions claimed in prior years under the simple interest method compared to the deductions that would have been allowable under the OID rules for those years."

**[\*26]** activities of none rose to the level of carrying on a trade or business), *aff'd*, 770 F. App'x 1016 (11th Cir. 2019).

Activities relating to undeveloped real property are subject to a facts and circumstances test to determine whether the activities rise to the level of a trade or business. *See Polakis v. Commissioner*, 91 T.C. 660, 669–70 (1988). It is not a trade or business where development activities are in the exploratory or formative stages. *Conner*, T.C. Memo. 2018-6, at *25. Among the tests that the courts have come to rely on in determining the nature of the taxpayer's activities with respect to real estate are the following:

> the nature and purpose of the acquisition of the property and the duration of the ownership; the continuity of sales or sales-related activity over a period of time; the volume and frequency of sales; the extent to which the taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of sales when compared to other sources of taxpayer's income.

*Polakis*, 91 T.C. at 670.

X-Way Delta acquired its property after 20 years of petitioner's failed attempts to develop it and after the Investors lost faith in its potential. X-Way Delta has not sold or developed the property, and the one potential sale of the property in 2007 fell through because of a downturn in the economy. Petitioner believes that, since then, environmental problems in the Salton Sea area have increased. He analogizes the Salton Sea area to the Love Canal, and he believes that the doors to development of the property have been shut. He thinks that the value of the property is in holding onto it long enough, and then someone will be able to make use of minerals under it or develop it for hydrothermal energy. He has not shown that he advertised the property or otherwise sought purchasers or development opportunities for it.

Petitioner has failed to convince us that, during 2014 and 2015, X-Way Delta's activities with respect to its property amounted to a trade or business. X-Way Delta was holding its property for long-term appreciation. And while petitioner reported $5,000 of receipts each year on Schedule C–1 as payment for an easement granted to a fish farm, he has not shown that the easement burdened property owned by X-Way Delta (as opposed to petitioner's portion of the Salton Sea property,

**[\*27]** which he has not shown that he transferred to X-Way Delta). In any event, $5,000 is less than one-half of one percent of the $1,200,000 that X-Way Delta claims to have paid the investors for what may have been more than 1,000 acres. And, even if the easement did burden a portion of X-Way Delta's property (nothing in the record tells us how much), petitioner has failed to convince us that the easement rental was more than an incidental aspect of what was overwhelmingly an investment purpose for holding the property. *See, e.g.*, *Anderson v. Commissioner*, T.C. Memo. 1982-576, 1982 Tax Ct. Memo LEXIS 169, at \*19; Treas. Reg. § 1.469-4(b)(1). Accordingly, petitioner cannot deduct the interest X-Way Delta accrued on the Note for 2014 or 2015 as interest allocable to trade or business.

Perhaps because respondent sees the easement rental as incidental to holding the property for investment (i.e., for appreciation), he does not argue for application of the passive activity loss rules. *See* Temp. Treas. Reg. 1.469-1T(e)(3)(vi)(B).

And perhaps because under that temporary regulation the easement rental is incidental to holding the property for investment, he is willing to concede that, if the property is not trade or business property, it is property held for investment (and the interest is not personal interest), despite the poor fit under sections 163(d)(5)(A)(i) and 469(e)(1). We accept that X-Way Delta's 2014 and 2015 interest payments were payments of investment interest. Petitioner's deduction of that interest for each year cannot exceed his net investment income. *See* § 163(d)(1). We leave that computation to the parties under Rule 155.

C.  *Other Disallowed Schedule C–1 Expenses*

Petitioner claimed expense deductions (other than for the accrual of interest) of $10,869 and $11,593 for 2014 and 2015, respectively, for legal and professional services, office expense, taxes and licenses, travel, utilities, and other expenses (together, noninterest expenses).

Petitioner argues that he substantiated the noninterest expenses during respondent's examination of his 2014 and 2015 returns.

Tax Court proceedings are de novo reviews of the taxpayer's liability. *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 328 (1974). The notice of deficiency is the starting point for our review, and "our determination as to a [taxpayer's] tax liability must be based on the merits of the case and not any previous record developed at the

[*28] administrative level." *Id.* Respondent disallowed the noninterest expenses, and petitioner has failed to substantiate those expenses. We will sustain respondent's disallowance.

## V.  *Capital Gains*

Island Mountain reported to petitioner capital gain income of $23,655 and $19,170 for 2014 and 2015, respectively. Petitioner misreported those amounts on his 2014 and 2015 Schedules E. Respondent, in effect, disregarded those erroneous Schedule E inclusions and increased petitioner's 2014 and 2015 Schedule D income by like amounts. Petitioner failed to address the issue on brief, and we see no error. We sustain the adjustments.

## VI.  *Social Security Benefit*

Petitioner reported a 2014 Social Security benefit of $9,942. Respondent disregarded that reported amount because he believed that petitioner had erroneously computed the taxable portion of the benefit. Instead, he increased petitioner's income for Social Security benefits by $8,451, which he describes as a computation adjustment. Petitioner has shown no error in respondent's adjustments. We sustain the adjustments.

## VII.  *Accuracy-Related Penalty*

### A.  *Introduction*

Section 6662(a) and (b)(1) provides for an accuracy-related penalty of 20% of the portion of an underpayment of tax required to be shown on a return attributable to negligence or disregard of rules and regulations (without distinction, negligence). Section 6662(a) and (b)(2) provides for the same penalty amount on the portion of an underpayment of tax attributable to any substantial understatement of income tax. In the case of an individual, there is a substantial understatement of income tax for a year if the amount of the understatement exceeds the greater of (1) 10% of the tax required to be shown on the return for the tax year or (2) $5,000. § 6662(d)(1)(A). The amount of an understatement is reduced if there is substantial authority for the taxpayer's treatment of an item on his return. *See* § 6662(d)(2)(B)(i). Also, the amount of the understatement is reduced for any item that is adequately disclosed in the taxpayer's return, or in an attached statement, if there is reasonable basis for the taxpayer's treatment of the item. *See* § 6662(d)(2)(B)(ii). Finally, section 6664(c)(1)

**[\*29]** provides a reasonable cause exception to imposition of the section 6662(a) accuracy-related penalty on that portion of an underpayment for which it is shown that there was reasonable cause and the taxpayer acted in good faith.

Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b). Treas. Reg. § 1.6662-2(c).

B.    *Burden of Production*

1.    *Introduction*

The Commissioner bears a burden of production with respect to the accuracy-related penalty including making a prima facie case that the section 6751(b)(1) requirement for written supervisory approval has been met. *E.g.*, *DeCrescenzo v.* Commissioner, T.C. Memo. 2023-7, at \*18. Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

2.    *Penalty Approval*

We have found that Ms. Chernyak, RA Kawamoto's acting direct supervisor, signed the penalty approval form before respondent issued the Deficiency Notice. Petitioner does not question that finding, nor does he argue that approval should have come sooner (or does the record provided any basis for an argument to that effect). The record is sufficient for us to conclude that respondent has made a prima facie case with respect to the penalty approval required by section 6751(b)(1).

3.    *Grounds for the Penalty*

Respondent has also made a prima facie case for the accuracy-related penalty on the grounds that, for 2015, petitioner underpaid his income tax because of his substantially understating the tax he was required to show on his return. The amount of tax petitioner was required to show was approximately the amount of the deficiency in tax shown in the first paragraph of this report. Petitioner reported a zero-tax liability on the 2015 return. Thus, for 2015, his understatement of income tax was both equal to (100% of) the tax required to be shown on

[*30] the return and more than $5,000. In other words, it was a substantial understatement of income tax. *See* § 6662(d)(1)(A).

Respondent claims as an alternative basis for the accuracy-related penalty that petitioner's 2015 underpayment of tax was due to negligence. We need not reach that question.

C.    *Burden of Proof*

Respondent having met his burden of production with respect to the penalty, the burden of proof (viz, the risk of nonpersuasion) is with petitioner, which includes the burden to prove any affirmative defense. *See, e.g., Fabian v. Commissioner*, T.C. Memo. 2022-94, at *38. Petitioner makes no claim to any affirmative defense.

As we understand petitioner's arguments they are as follows:

Respondent's Attorney claims IRS Sec 6662(a) applies because no adequate records were kept by Petitioner[,] . . . [and] since her superiors approved the penalties, then that constitutes proof of their validity. . . .

. . . It appears that Respondent's Attorney's position . . . is that if income is reported on the wrong schedule, it is in fact classified as unreported and the penalty should apply.

. . . Respondent's Attorney maintains that the mere fact of using the wrong schedule is enough to trigger the application of the penalty.

Petitioner's first argument may misunderstand the section 6751(b)(1) approval process. Penalty approval here was obtained before the Deficiency Notice was issued, not by respondent's counsel but by RA Kawamoto from her supervisor, Ms. Chernyak. In any event, supervisory approval is merely procedural and does not establish the substantive validity of the penalty. As we have said: "We do not second-guess the extent of the RA's or the supervisor's deliberations about whether penalties should be imposed. We confine our search to seeking evidence of written supervisory approval." *Cattail Holdings, LLC v. Commissioner*, T.C. Memo. 2023-17, at *11. Petitioner may be mischaracterizing respondent's argument to be that we have to uphold the penalty because supervisory approval is sufficient to establish a penalty was warranted. That is not the case.

**[\*31]** Petitioner's remaining arguments misapprehend the accuracy-related penalty, which, here, we impose on the portion of petitioner's 2015 underpayment of tax attributable to his substantial understatement of his income tax. Respondent did not penalize petitioner for entering amounts on the wrong schedules; he penalized him for substantially understating his income tax. *See* § 6662(d)(2).

We uphold the accuracy-related penalty for 2015.

VIII. *Conclusion*

To reflect the foregoing,

*Decision will be entered under Rule 155.*